IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT LYNN PRUETT, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | H-17-CV-2418 |
| | § | |
| JACK K. CHOATE, et al., | § | |
| Defendants. | § | |

## **MEMORANDUM AND ORDER**

Plaintiff Robert Lynn Pruett is a Texas death row inmate. He is scheduled for execution on October 12, 2017. Defendant Jack Choate is the Executive Director of the Special Prosecution Unit that prosecuted Pruett for capital murder. Defendant Lisa Harmon Baylor is a forensic scientist with the Texas Department of Public Safety. The other defendants are officials of the Texas Department of Criminal Justice.

Pruett filed a civil rights complaint under 42 U.S.C. § 1983, alleging that he was denied due process in his proceedings to obtain postconviction DNA testing. D.E. 1 He seeks injunctive relief regarding DNA testing and a stay of execution. Defendants filed a motion to dismiss. D.E. 15 For the reasons stated below, the defendants' motion is granted, and the complaint is dismissed with prejudice.

### I. **Background**

The facts of the underlying capital murder case are set out in detail in the Fifth Circuit's opinion affirming this Court's denial of Pruett's petition for a writ of habeas corpus. *See Pruett v. Thaler*, 455 Fed. App'x 478, 479-81 (5th Cir. 2011). The facts of the crime are repeated here only insofar as they are relevant to the current proceeding.

Pruett was convicted of capital murder and sentenced to death for the murder of Daniel Nagle, a Corrections Officer employed by the Texas Department of Criminal Justice. Pruett was serving a 99 year prison sentence for murder at the time of the Nagle murder.

Evidence presented at trial showed that Nagle had written a disciplinary case against Pruett shortly before the murder. Nagle was stabbed eight times with a shank made of a metal rod sharpened at one end and wrapped in tape at the other end. He died from a heart attack suffered during the stabbing attack. The shank and a torn disciplinary report against Pruett were found at the scene of the murder.

Pruett was scheduled for execution in 2015. On the day of his scheduled execution, he moved in state court for DNA testing of evidence. The trial court granted the motion and tests were conducted. The trial court then held an evidentiary hearing and denied relief. The Texas Court of Criminal Appeals ("TCCA") summarized the relevant facts concerning the postconviction hearing.

> According to the report issued by DPS forensic scientist, Lisa Harmon Baylor, testing on [Pruett]'s pants and shirt revealed profiles that were consistent with [Pruett] and excluded the victim. Testing on the victim's shirt and pants and blood found in the multipurpose room revealed profiles that were consistent with the victim and excluded [Pruett]. These results were consistent with the results obtained after testing the items before [Pruett]'s trial. No DNA profile was obtained from testing on the masking tape wrapped around the handle of the metal rod or from testing on a piece of blue plastic removed from the metal rod. A swabbing from the metal rod revealed an unknown female profile. Testing of the rod before trial revealed no such profile.
>
> At the August 13, 2015, hearing concerning this testing, the court first stated that a prior motion for DNA had been granted in 2013, and the results had been inconclusive. The court also noted that the State had made all of the evidence in the case available for several years, but [Pruett] had not requested testing of the metal rod and tape in the 2013 motion. The court then noted that [Pruett]'s

counsel sought information about testing the rod and tape nearly two weeks before [Pruett]'s scheduled execution date, and information was provided the next day regarding whom to contact to obtain testing. However, counsel waited nearly ten days to contact the person identified, and then contacted that person on the Sunday preceding the Tuesday execution date. Finally, the court noted that [Pruett] had requested funding for an expert, which the court denied. But the court added, "If I heard additional evidence that warranted the granting of $6,000—or somewhere around that amount—to the defense, I would consider it after I heard the evidence today." The court thereafter heard testimony from two witnesses called by the State. The defense did not present any witnesses.

Baylor testified that she was the analyst who conducted the original pretrial DNA testing and testified at [Pruett]'s trial. Baylor testified consistently with the report she issued on her testing, which included the results she obtained on the items listed in the May 8 order. Baylor testified that, despite her effort, she was unable to obtain a DNA profile from the masking tape. She testified that she had very little success obtaining much DNA from tape samples in the past because of the "surface area" and how the tape had been handled. Additionally in this case, the tape was covered in black powder because it had been processed for potential fingerprints right after the murder. Baylor explained that, at the time of this offense, DNA testing was new, and the investigators had to choose between DNA testing, which might destroy print evidence, and testing the tape for prints. Here, they chose to test the tape for prints.

Baylor testified that she processed the metal rod in 2000, but was unable to obtain a DNA sample. However, when she re-swabbed and tested the rod in 2015, she obtained a DNA profile consistent with that of an unknown female. Baylor stated that, upon finding that result, she conducted the proper checks to ensure that the findings had not been contaminated within the laboratory or during her analysis. She found no contamination. She also re-tested the sample preserved from the testing conducted before trial, and she again obtained no DNA profile. Baylor testified that, because of the disparate results obtained from the concurrent testing of the old and new samples, she was certain that the female profile was not present on the metal rod when she first tested it in 2000. She opined that the profile must have come from someone who handled the evidence after it was tested in 2000. She also noted that, especially ten to fifteen years ago, evidence was regularly handled

3

by any number of people in the courtroom during trial.

The second witness to testify at the hearing was William Lazenby. Lazenby testified that he had been employed as the bailiff/security officer for Bee County and the Bee County courts since 2009. His prior employment included working for the Texas Department of Criminal Justice. He was an investigator on the McConnell Unit when this crime occurred and was part of the investigative team in this case.

Lazenby testified that some time in the two years before the August 2015 hearing, he was contacted "about some attorneys or, maybe, employees of attorneys and a film crew wanting to look at the evidence in [[Pruett]'s] case [.]" He stated that a male and a female with the British Broadcasting Corporation (BBC) and some female attorneys wanted to look at some evidence related to [Pruett]'s case. He noted that, in at least one instance, he saw the evidence, including the metal rod, laid out on the table in front of these four individuals, and no one was wearing gloves. The only other time he saw the metal rod after that was when it was secured and sent for DNA testing by people at the district clerk's office who wore gloves as they handled the evidence.

Finally, the State offered a video from television station KWTX into evidence. The video shows a woman with no gloves on handling the metal rod. The trial court concluded from all of the evidence that there was nothing on the metal rod that was inculpatory or exculpatory, nothing on the tape at all, and nothing on the additional items that was inculpatory or exculpatory. The court found that, although an unknown sample was found on the metal rod, there was no such sample present when the rod was originally tested, and any evidence that previously existed on the rod had since been contaminated.

In its written findings and conclusions, the trial court first set out the background of the case, which we paraphrase below:

> 1. The State made all of the evidence available for DNA testing for over fifteen years before [Pruett]'s most recent request. In fact, [Pruett] made a request for DNA testing in 2013, and the results were inconclusive.
>
> 2. [Pruett] did not include in his 2013 motion for DNA testing a request that the metal rod and the tape wrapped around it be tested.

4

3. [Pruett] asserted that testing should be done now because newer DNA testing techniques exist. However, those same testing techniques existed in 2013.

4. [Pruett] began seeking information regarding DNA testing of the metal rod after business hours on Thursday, April 16, 2015. Although the State responded with the necessary information the next day, [Pruett] waited nearly ten days before contacting the laboratory, and then he contacted the laboratory by email on the Sunday two days before the scheduled execution when the laboratory was closed.

5. [Pruett]'s counsel failed to file an Affidavit of Good Cause for failing to comply with the Court of Criminal Appeals "Seven Day Rule" when they requested a stay of execution on the day of the execution.

6. Upon reviewing [Pruett]'s motion for DNA testing, and in deciding to allow testing, the trial court stated that it "ha[d] no doubt the request for the proposed DNA testing was made to delay the execution of sentence." However, the court was not willing "to punish [[Pruett]] for his attorney's dilatory tactics." Thus, the court granted the testing.

7. After the laboratory tested the requested items and more, the court held a hearing on August 13, 2015, at which the State called two witnesses:

> (1) Lisa Baylor, a DPS employee and DNA expert, testified that she conducted the current testing, and she conducted the DNA testing performed at the time of trial. She also testified at [Pruett]'s trial. Baylor unequivocally testified that the metal rod contained no DNA profile in 2000 when she originally tested it. In fact, she re-tested the original sample during this round of testing and again found no DNA profile. However, when the metal rod was tested in

5

2015, it contained an unknown female profile. With regard to the tape, Baylor testified that no DNA profile was found on the tape that had been wrapped around the rod. Baylor also testified that recently published problems with the FBI database and related calculations were addressed during testing. Other DNA samples from the victim and [Pruett] were identified during testing, but were found not to be relevant to the court's findings and conclusions.

(2) William Lazenby was the supervisor of the investigative team that worked the Nagle murder. Lazenby testified that, in 2009, he became a bailiff for the courts in Bee County. He further testified that, sometime in the two years before the August 2016 hearing, [Pruett] and his attorneys cooperated with the British Broadcasting Corporation (BBC) while they prepared a story on [Pruett]. During that preparation, Lazenby observed the television crew and members of counsel's staff handling the evidence, including the metal rod, and none of them were wearing gloves. Several females were in the group. Lazenby subsequently observed members of the district clerk's office prepare the items for transfer to DPS, but those individuals were wearing gloves.

8. [Pruett] presented no witnesses at the hearing.

Based upon the evidence presented at the hearing, the trial court then made the following findings of fact, which are paraphrased in pertinent part as follows:

1. As tested in 2015, the tape wrapped around the metal rod contained no DNA profile.

2. There was no DNA profile on the metal rod when it was originally tested for trial in 2000.

3. When tested in 2015, the metal rod contained an unknown female DNA profile. However, since 2000, that metal rod was handled on numerous occasions by members of the BBC and [Pruett]'s own defense team, with no one wearing gloves.

4. The DNA profile found on the metal rod during the most recent testing, which was not present on the rod when it was originally tested, cannot be considered relevant to this motion.

5. Baylor's testimony adequately addressed the most recent problems concerning the FBI database and DNA calculations.

6. The motion for DNA testing and the motion to stay [Pruett]'s execution were not filed until the day [Pruett] was scheduled for execution, even though counsel emailed the motions to the trial court the day before.

7. [Pruett]'s counsel were aware of the prior failure to test the requested items as early as April 16, 2015. However, for some inexplicable reason, they waited until two days before the execution to contact the DNA expert.

8. No affidavit for good cause was attached to [Pruett]'s pleadings in violation of the Court of Criminal Appeals Miscellaneous Rule 11–003.

9. On July 23, 2015, [Pruett] filed his first motion for the authorization of funds for expert services requesting $5750.00. During the August 13 hearing, [Pruett] re-urged his request, but the court withheld its ruling until all of the evidence had been presented.

On August 17, 2015, [Pruett] filed his second motion for the authorization of funds for expert services requesting $6500.00. Because the trial court found that there was no relevant DNA

> evidence to further consider, the court denied the requests. Given the results of the testing and the evidence presented at the hearing, the court concluded that, had the results been available during the trial of the offense, it was not reasonably probable that [Pruett] would not have been convicted.

*Pruett v. State*, No. AP-77,065, 2017 WL 1245431, at *6–9 (Tex. Crim. App. Apr. 5, 2017) (footnotes omitted).

## II. Analysis

Pruett contends that the Texas DNA testing statute, TEX. CODE CRIM. PROC., ch. 64 ("Chapter 64") creates a constitutionally protected liberty interest, and that he was denied his liberty interest without due process by the Texas courts' misinterpretation of the statute and the courts' improper and arbitrary application of the statute and procedures in this case. He seeks injunctive relief compelling specific testing of evidence, and compelling defendant Baylor and Choate to produce certain materials for review and testing.

Defendants do not dispute that Pruett has a liberty interest in DNA testing, but argue that he is not entitled to relief. They move to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

### A. Standard of Review

#### 1. Rule 12(b)(1)

A federal court must dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate the plaintiff's claims. *Home Builders Assoc' of Miss., Inc., v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). In resolving a motion under Rule 12(b)(1), a court may refer to evidence outside the pleadings. *Espinoza v. Mo. Pacific R. Co.*, 754 F.2d 1247, 1248 n. 1 (5th

Cir. 1985). When the jurisdictional issue is of a factual nature rather than facial, plaintiff must establish subject matter jurisdiction by a preponderance of the evidence. *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989).

### 2. Rule 12(b)(6)

In reviewing a motion to dismiss under rule 12(b)(6), the complaint must be liberally construed in favor of the plaintiff and all facts pleaded in the complaint must be taken as true. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). The standard of review under rule 12(b)(6) has been summarized as follows: "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 601 (1969).

## B. Due Process

Pruett argues that the Texas courts have deprived him of his liberty interest by interpreting and applying Chapter 64 in a manner that frustrates the legislative intent behind the statute. This is, in essence, an argument that the Texas state courts have misinterpreted Texas state statutory law. He asks this Court to find that Chapter 64 is unconstitutional as applied to him in this case because the Texas courts have misinterpreted the statute and because they have applied it in an arbitrary and inconsistent manner.

Defendants argue that Pruett's claim amounts to a request for a writ of mandamus ordering Texas state officials to comply with what Pruett characterizes as the requirements of Chapter 64. Pruett denies that he seeks mandamus, but states that he seeks a finding that Chapter 64 is unconstitutional as applied, and asks the Court to order a remedy. Specifically, he

asks the Court to order "Baylor . . . to provide to Pruett copies of any diagrams, data, or emails related to either the 2000 analysis or 2015 analysis . . .," and to order either Baylor or Choate to release the shank and Nagle's clothing for testing. Reply (D.E. 16) at 18-19.

Pruett's claims are materially indistinguishable from the relief sought in *Swearingen v. Keller, et al.*, No. 1:16-cv-1181 (W.D. Tex. July 7, 2017) (D.E. 18). In *Swearingen*, another Texas death row inmate filed suit challenging a Chapter 64 proceeding as "inconsistent and arbitrary." *Id* at 5. He sought a declaratory judgment that Chapter 64, as interpreted by the Texas Court of Criminal Appeals, was unconstitutional, and injunctive relief compelling specific defendants to release evidence for testing. The Western District of Texas court found that "[s]ince Swearingen seeks only declaratory and injunctive relief, his pleading is properly construed as a petition for mandamus relief . . . ." This analysis is equally applicable to Pruett's claims.

A federal court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. "But a federal court lacks the general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties where mandamus is the only relief sought." *Moye v. Clerk, DeKalb Cty. Superior Court*, 474 F.2d 1275, 1276 (5th Cir. 1973); *see also Noble v. Cain*, 123 F. App'x 151, 152 (5th Cir. 2005) ("mandamus relief . . . is not available to federal courts to direct state officials in the performance of their duties and functions"); *Johnson v. Hurtt*, 893 F. Supp. 2d 817, 827 (S.D. Tex. 2012) ("federal courts lack the general power 'to direct [or compel] state officials in the performance of their duties and functions'") (quoting *Noble*, 123 F. App'x at 152).

10

The only relief Pruett seeks is an order compelling Texas officials to comply with what Pruett sees as the requirements of Chapter 64, or to act so as to allow Pruett independently to effectuate his rights under Chapter 64. Regardless of how Pruett chooses to characterize this relief, it is, at its core, mandamus. Because this Court lacks jurisdiction to issue a writ of mandamus, the complaint must be dismissed.

### C. Stay of Execution

Pruett also seeks a stay of execution to allow him to pursue additional DNA testing. In reviewing an application for a stay of execution, this Court must consider

> (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would harm the public interest.

*O'Bryan v. McKaskle*, 729 F.2d 991, 993 (5th Cir. 1984); *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982), *cert. denied*, 465 U.S. 1013 (1984); *Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982). Although the movant in a capital case need not always show a probability of success on the merits, he must present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities, *i.e.*, the other three factors, weighs heavily in favor of granting the stay. *Celestine v. Butler*, 823 F.2d 74, 77 (5th Cir.), *cert. denied*, 483 U.S. 1036 (1987); *McKaskle*, 729 F.2d at 993; *Ruiz*, 666 F.2d at 856. In a capital case, the possibility of irreparable injury weighs heavily in the movant's favor. *Estelle*, 691 F.2d at 708. The irreversible nature of the death penalty, however, must be weighed against the fact that there must come a time when the legal issues in the case have been sufficiently litigated so that the law must be allowed to run its course. *Id.*

For the reasons discussed above, Pruett fails to demonstrate that he has a substantial case on the merits. Therefore, he is not entitled to a stay of execution.

### D. Conclusion

For the foregoing reasons, this case is dismissed with prejudice.

## III. Order

It is **ORDERED** that:

1. The defendants' motion to dismiss (D.E. 15) is **GRANTED**; and

2. The complaint (D.E. 1) is **DISMISSED WITH PREJUDICE**.

SO ORDERED

**SIGNED** at Corpus Christi, Texas, on this 25th day of September 2017.

Nelva Gonzales Ramos
United States District Judge